L. C. WRIGHT, Appellant, v. F. S. NORRIS, Appellee.

**TRIAL: Cautionary Instructions—Improper Use of Testimony.** A jury
1   should, in case the state of the evidence presents the danger, be
    appropriately warned against finding a cause of action established
    on testimony incompetent for *that* purpose. So held where there
    was danger that a tenant's counterclaim, based on 'alleged false
    representations as to the adequacy of a water supply, might be
    found to be established from testimony bearing on an *oral* agree-
    ment by the landlord, contemporaneous with the execution of the
    written lease, *to furnish an adequate water supply.*

**LANDLORD AND TENANT: Counterclaim Against Rent—Improper
2   Measure of Damages.** Where a tenant's counterclaim against an
    action for rent was based on alleged false representations by the
    landlord as to the adequacy of the water supply, and was tried on
    the theory that the measure of damages was the difference between
    the rental value of the farm with and without an adequate water
    supply, evidence is inadmissible: (1) That a subtenant was com-
    pelled to haul water for a great distance; and (2) that the poor
    water on the farm had a bad effect on the stock.

**FRAUD: Scienter—Insufficient Evidence.** A counterclaim at law should
3   not be submitted when there is no evidence tending to show that
    the party making the representations knew that the representations
    were false.

*Appeal from Linn District Court.—*F. O. ELLISON, *Judge.*

APRIL 8, 1922.

PLAINTIFF brought suit upon a rent note. The defendant
presented a counterclaim for damages for alleged false repre-
sentations which induced the making of the note and the under-
taking of the lease. There was a verdict allowing the counter-
claim and a judgment thereon. The plaintiff has appealed.—
*Reversed and remanded.*

*F. A. Heald* and *E. A. Fordyce,* for appellant.

*Voris & Haas,* for appellee.

EVANS, J.—On April 23, 1919, plaintiff leased a farm of 75 acres to the defendant, at an agreed rental of $440. The farm was leased by the defendant largely for pasturing purposes. He was engaged in the business of buying and selling stock, and proposed to keep his stock upon the rented farm. The defendant alleged in his counterclaim that the plaintiff represented to him that there was plenty of water on the farm, both for domestic and stock purposes, and that such representation was false, and known by the plaintiff to be false when made. These allegations were denied by the plaintiff, both by pleading and by testimony.

In order to get the bearing of certain assignments of error, it is necessary first to present a bird's-eye view of the case, and then to set forth certain parts of the record. The plaintiff had owned and occupied the farm in question for a great many years. Two years before the date of the lease to the defendant, he had sold the farm to one Pratt. Pursuant to the contract of sale, Pratt occupied the farm for the years of 1917 and 1918. Being unable to perform his contract, Pratt conveyed back the farm to the plaintiff, and moved off on the first of March, 1919. During Pratt's occupancy of the farm, the defendant had kept a considerable number of cattle upon the farm, by arrangement with Pratt, and these remained upon the premises after Pratt's departure, and up to the time of the execution of the lease by the plaintiff, on April 23d. There was a large slough upon the farm, which, for the greater part of the time, furnished the ordinary source of the water supply to the stock. There was also upon the farm a spring, as a further source of supply. For many years this spring had been the only source of supply for water for domestic use. Twenty years before the events involved herein, a well was sunk upon the place, to a depth of 196 feet. This well had been used by the plaintiff and his family continuously up to the time of the selling of the farm to Pratt. Pratt had broken the pump, so that the well was not in use at the time the lease was entered into, nor had it been in use at any time for several months prior thereto. The defendant's cattle kept by Pratt upon said farm obtained their water supply from the slough, and perhaps from the spring. This was true throughout the winter months. The defendant was not living upon the farm, and the house thereon was empty until the last of July, when the defend-

ant put a tenant therein. At this time, the pump was repaired.
The water in the slough was scarce and bad. The water from
the well proved to be insufficient in quantity, and to be sandy
and muddy. After his sale to Pratt, plaintiff did not live in
the vicinity of the farm. During Pratt's occupancy of the farm,
he had found the supply of water to be in the condition here
described. There was evidence that he had communicated the
fact to the plaintiff; and likewise, evidence that he had com-
municated it to the defendant. The defendant's answer, setting
forth the alleged false representations, was very elaborate and
definite. The evidence in support of it was very brief and very
indefinite. The defendant himself had been acquainted in a
general way with the farm and its appurtenances for 14 years.
He had frequently been upon the place during the occupancy
of the plaintiff, in the pursuit of his business of stock buying.
The defendant's testimony as to the false representation was
as follows:

"A. Well, there was something in regard to the pump and
well. Q. Tell us what was said there. A. I told him there was
something I would like to ask him. I asked him if there was a
good well there, and he said, 'The well is in the neighborhood of
200 feet deep,' he said, 'you know,'—in fact, I was there and
helped him saw wood one day, worked all day and helped him
saw wood, before I moved to Central City, some years ago. He
had a large bunch of cattle, and talking over the water, he said,
'You know, when I was here, I always had plenty of water,—
we will fix that up all right,—there will be no trouble about the
water.' Q. What else was said about the well? A. He said it
was a good well. * * * Q. Now, was there any other talk about
water in the well? A. Yes. Q. What was said about that?
A. I don't know as there was—I don't know of anything in
regard to any water; only I was to water my stock, and have
plenty of water.

### Cross-examination.

"I don't recollect that I asked Wright about the water in
the well; don't remember he told me about the quality of the
water in the well,—I didn't ask him about that. Pratt had va-
cated quite a while before I rented. * * * At that time I think

I asked him if the well was all right. He said, 'Frank, you know I had lots of water when I was here,—lots of stock,—always had lots of water.' That was true, to the best of my knowledge. I know he had lots of water. He was telling me what I already knew. Q. Was that all that was said? A. I can't answer that,—I think not; I think several things; I think considerable talk about it. I do not recollect anything further that was said.''

He also testified:

''I used to buy cattle of Wright. He had a tank in the yard at the well. Yes, I suppose the well was all right when Mr. Wright was there: he had water in the tank, and it seems to have come from the well. I would say Wright has not been on the place for something like three years. He was living 3 or 4 miles from this place. The year before I was there, a man named Pratt lived on the place. I had a few cattle on the place, the year Pratt was there,—the winter prior to the time I leased the place; think I had somewhere around 10 head there. Think I put my cattle on the place about New Year's, and had them there till Pratt moved away, about the first of March. Pratt had charge of my cattle, and fed them, and I suppose he watered them on that place. He told me if I dug a cistern, there would be a great deal of water in it. I know where the cattle were watered. They were watered at the slough. It was a very open winter. I believe the cattle got the water on the place. Can't say that they had any water from the well. I was out there a good many times. Q. Don't you know the cattle got their water from the spring in the slough? A. Yes, they might have got some there. I never saw them get water from this well. Those cattle were running there from the first of January till some time after the first of March. I don't know whether this spring froze up or not. I went down there to see what kind of water the cattle were getting when Pratt was on the place.''

It will be noted that the representations thus testified to by the defendant related to the condition of the well when plaintiff occupied the farm. Such representations as of such time were concededly true. As regards the present time when the representations were made, the undertaking of the plaintiff was:

''We will fix that up all right. There will be no trouble

about the water. * * * I [defendant] don't know of anything in regard to any water; only I was to water my stock, and have plenty of water.''

The foregoing will be a sufficient statement to enable us to consider some of the principal errors assigned.

I. The plaintiff requested the following instruction to be given to the jury:

''You are instructed that you can allow defendant nothing on the theory that there was any agreement, express or implied,

**1. TRIAL: caution-ary instructions: improper use of testimony.** on the part of the plaintiff to furnish water for said farm. All agreements in regard to leasing are conclusively presumed to be contained in the written lease between the parties.''

The pertinency of this instruction is indicated by the evidence above quoted. There was a written lease. The verbal undertaking testified to by the defendant was not included therein. This evidence was admitted only as a part of the alleged false representation. The distinction between a false representation and a mere agreement to perform would not be self-evident to a jury. It was important that such a distinction should be comprehended by them. The requested instruction was appropriate to that end. Nothing equivalent thereto was given by the court on its own motion.

II. The plaintiff requested the following instruction:

''You are instructed that you can allow the defendant no damages claimed in evidence to have been sustained by defendant's stock by reason of poor or insufficient water, nor can you

**2. LANDLORD AND TENANT: coun-terclaim against rent: improper measure of damages.** allow any damages by reason of the tenant having to haul water from neighbors, if the tenant did so haul water.''

The case was tried on the theory that the measure of damages, if any, of the defendant was the difference between the rental value of the farm with and without a water supply from the well. The trial court properly submitted such measure of damages to the jury. The defendant, however, was permitted to show that his subtenant had hauled water for his own domestic use for a distance of a quarter of a mile, and farther.

The defendant was also permitted to show that bad water was bad for stock; that insufficient water was likewise bad for them; and that his stock were reduced in condition and depreciated in value because of the failure of the well supply and of the quality of what it did supply. All this testimony was received subject to objection. There might be some ground for saying that the evidence of the subtenant was admissible, as in the nature of corroboration of the alleged failure of the well. Assuming it to be admissible for such purpose, and for such purpose only, it was not proper that it should be regarded as evidence of measure of damages. The possible necessity of such a recourse would necessarily be taken into consideration by the opinion witnesses in stating their estimates of the depreciation of value of the lease. It was proper, therefore, that the jury should be admonished not to base an allowance of damages upon such hypothesis. As to the testimony of the defendant concerning the depreciation of the value of his stock, we see no possible ground upon which it could be deemed admissible at all. If such damages could have been proved in any event, and upon any state of facts, they would be in the nature of special damages, and should be pleaded before they could be proved. The error in admitting this testimony might, perhaps, have been cured by the giving of the requested instruction. No equivalent was given on the court's own motion. The refusal to give such instruction or its equivalent was error.

III. At the close of the evidence, there was a motion by the plaintiff for a directed verdict, and this motion was overruled. After verdict, there was a motion for a new trial, which was also overruled. The printed record, as presented to us, impresses us that the verdict was a grave miscarriage of justice. If it could be said at all that there is any evidence of false representation, as distinguished from a mere agreement or undertaking on the part of plaintiff, it yet remains that there is no evidence that the representation actually made by the plaintiff was known by him to be false. The trial court should have sustained the motion for a directed verdict. It necessarily follows that a new trial ought to have been granted, after the verdict. The judgment below is, accordingly, reversed, and the cause remanded for

3. FRAUD: scienter: insufficient evidence.

further proceedings consistent herewith.—*Reversed and re-manded.*

Stevens, C. J., Arthur and Faville, JJ., concur.